TEXTO COMPLETO DE LA SENTENCIA
El 2 de septiembre de 2004, se presentó ante este Tribunal el recurso de epígrafe. Belford Ramírez, Inc. recurre de la Sentencia dictada por el Tribunal de Primera Instancia, Sala de Mayagüez, quien, luego de un juicio en sus méritos, declaró No Ha Lugar la demanda presentada por éstos contra el Banco Santander de Puerto Rico donde, en esencia, se reclamaban daños por la reducción en su línea de crédito. Con el beneficio de la transcripción de la prueba testifical, la prueba documental, los autos originales, los alegatos y alegatos suplementarios de las partes, procedemos a resolver.
I
El 25 de agosto de 1997, los apelantes Almacén Belford Ramírez, Inc., Inversiones Belford Ramírez, Inc. y Supermercado Belford Ramírez, Inc. (en adelante Belford), presentaron una demanda en daños y perjuicios contra el Banco Santander de Puerto Rico. En la misma y en lo pertinente, se alegó que las Empresas Belford Ramírez eran corporaciones con oficinas principales y lugar de negocios en Cabo Rojo, Puerto Rico; que obtuvieron préstamo a término fijo y una línea de crédito del Banco Santander por la suma total de $4,300,000.00; que en o para el mes de octubre de 1994, el Banco le requirió hiciera abonos sustanciales a la línea de crédito; que, posteriormente, el Banco redujo unilateralmente la línea de crédito que tenía aprobada la apelante de $2,300,000.00 a $1,300,000.00, y que la apelante sufrió daños producto de las actuaciones culposas y/o negligentes de la parte allí demandada.
El Banco contestó la demanda y negó las alegaciones esenciales contenidas en la misma. Luego de un extenso trámite de descubrimiento de prueba, el 13 de febrero de 2002, se celebró la conferencia con antelación ajuicio y se aprobó el informe presentado por las partes.
El 2 de abril de 2004, el Banco presentó una moción solicitando sentencia sumaria. Planteó que no existían hechos materiales en controversia. Ello, porque, en esencia, las actuaciones del Banco fueron cónsonas con el contrato suscrito entre las partes. En la moción planteó, entre otros, como sigue:

*1129
Las corporaciones demandantes Almacén Belford Ramírez, Inc., Inversiones Belford Ramírez, Inc. y Supermercado Belford Ramírez, Inc., eran, para la fecha de los hechos alegados en la Demanda, clientes del demandado Banco Santander;

El día lero. de abril de 1986, el señor Alfred Santana, en representación de la parte demandante (Inversiones Belford Ramírez, Inc.), entregó a Banco Santander para su custodia los siguientes pagarés:

- Pagaré al Portador por la suma principal de $300,000.00, con vencimiento a la presentación, garantizado por Escritura Número 26 sobre Hipoteca, autenticado mediante affidavit número 7231 ante el Notario Público Jaime E. Sepúlveda Seda, suscrito el día 29 de marzo de 1974;

- Pagaré Hipotecario a favor del Portador por la suma principal de $200,000.00, con vencimiento a la presentación, garantizado por Escritura Número 5 sobre Hipoteca, autenticado mediante el affidavit número 45 ante el Notario Público Luis E. Pérez Lebrón, suscrito el día 11 de noviembre de 1975;

- Pagaré Hipotecario a favor del Portador por la suma principal de $250,000.00, con vencimiento a la presentación, garantizado por Escritura Número 12 sobre Hipoteca, autenticado mediante affidavit número 3374 ante el Notario Público Iván Ramos, suscrito el día 26 de mayo de 1978;

- Pagaré Hipotecario a favor del Portador por la suma principal de $250,000.00, con vencimiento a la presentación, garantizado por Escritura Número 52 sobre Hipoteca, autenticado mediante affidavit número 984 ante el Notario Público Manuel Rivera Meléndez; (Exhibit Número 9 Estipulado Pre-Trial);

- El Sr. Alfred Santana firmó, en representación de Inversiones Belford Ramírez, el documento titulado “Recibo de Valores Depositados en Custodia” número 1932 el lero. de abril de 1986; (Exhibit 1 );

- Este recibo, entre otras cosas, establece que: “La responsabilidad del Banco en relación con los valores o paquetes depositados estará limitada al ejercicio de cuidado razonable y la diligencia impuesta por la ley en guardar los valores o paquetes depositados, descritos en este recibo, y los mismos se aceptan por el Banco bajo el entendido expreso de que no se inferirá negligencia por parte del Banco por la pérdida o destrucción de los valores o paquetes depositados o ninguna parte de su contenido. ”

- El día 6 de marzo de 1992, la parte demandante Almacén Belford Ramírez, Inc. e Inversiones Belford Ramírez, Inc. y Banco Santander Puerto Rico suscribieron un “Contrato de Préstamo y Cesión de Cuentas por Cobrar”;

- En esa misma fecha, 6 de marzo de 1992, la parte demandante Almacén Belford Ramírez, Inc. y Banco Santander Puerto Rico suscribieron un “Contrato de Línea de Crédito ”; (Ver Exhibit 2);

- El día 6 de marzo de 1992, Inversiones Belford Ramírez, Inc., representada por su Presidente Pablo Belford Ramírez Asencio, otorgó la Escritura Número 118 sobre Hipoteca en Garantía de Pagaré con Interés Fluctuante ante el Notario don José L. Landrón Ramery. En la página siete (7) de la referida Escritura Número 118, el demandante manifestó lo siguiente:

El DEUDOR HIPOTECANTE postergó las hipotecas que afectan los inmuebles antes descritos a favor de la hipoteca por la suma de DOS MILLONES DE DOLARES ($2,000,000.00) según surge de la escritura número Treinta y Cuatro (34) otorgada el primero de abril de mil novecientos ochenta y seis (1986) ante el Notario José M. Biaggi Junquera, pendiente de inscripción al Asiento Cuatrocientos Noventa y Ocho del Diario Cuatrocientos Treinta y Dos (432).

*1130
-Manifiesta el DEUDOR HIPOTECARIO que los referidos pagarés postergados se le han extraviado y por la presente se obliga a radicar la correspondiente demanda de cancelación de pagarés extraviados y concluir el procedimiento presentando el correspondiente Mandamiento al Registro de la Propiedad. ” (Exhibit 3);

- El día 13 de febrero de 1990, la compañía First American Title Insurance expidió la póliza número FA-MM-107584 a favor de Banco Santander Puerto Rico garantizando la hipoteca por la suma de $2,000,000 constituida por Inversiones Belford Ramírez, Inc.

- El día 6 de marzo de 1992, la misma compañía (First American Title Insurance) expidió la póliza número FA-MM-107590 a favor de Banco Santander Puerto Rico garantizando la hipoteca por la suma de $2,300,000 constituida por Inversiones Belford Ramírez, Inc.;

- El demandante incumplió con la obligación constituida mediante el otorgamiento de la Escritura Número 118. Nunca canceló los pagarés hipotecarios en controversia ($300,000.00; $200,000.00; $250,000.00). A pesar de haber manifestado a la parte demandada Banco Santander que los referidos pagarés estaban extraviados y que los cancelaría, pero no los canceló;

- El demandante no manejaba adecuadamente Santander; línea de crédito que le fuera concedida por Banco

- El balance adeudado en la línea de crédito alcanzaba siempre la suma máxima concedida por Banco Santander. A pesar de que el demandante estaba supuesto a adquirir mercancía para la venta, vender la mercancía, cobrar y efectuar abonos a la línea de crédito, no efectuaba los abonos requeridos a la línea de crédito. (Exhibit 4);

- Durante el mes de marzo del año 1995, la parte demandante Almacén Belford Ramírez, Supermercado Belford Ramírez & Inversiones Belford Ramírez solicitaron y obtuvieron un financiamiento de Citibank, N.A.;

- Requirió Citibank como garantía hipotecaria los pagarés hipotecarios por $2,000,000.00 y $2,300,000.00 en poder de Banco Santander. El día 30 de junio de 1995, la parte demandante y Citibank suscribieron un “Contrato de Préstamo ”. La parte demandante cedió en garantía los dos pagarés anteriormente mencionados ($2,000,000.00 y $2,300,000.00) y un pagaré de $500,000.00 otorgado el día 23 de junio de 1995. En esa misma fecha, 30 de junio de 1995, la parte demandante efectuó un pago a favor de Banco Santander Puerto Rico por la suma de $2,801,746.61;

- Para el año 1995, los pagarés tenían rango preferente al pagaré de $2,300,000.00. Pero, conforme se establece en la Escritura Número 118, era la parte demandante la obligada a cancelar los referidos pagarés. La parte demandante incumplió con su obligación contractual al no cancelar los pagarés;

- Para el mes de marzo de 1992, la compañía de seguros de título First American Title Insurance Company había emitido sendas pólizas de seguro de título garantizando (a Banco Santander) rango preferente a los pagarés de $2,000,000.00 y $2,300,000.00 sobre los pagarés de $250,000.00;

- Para junio de 1995, cuando Citibank concedió el financiamiento a la parte demandante, la compañía de seguros de título emitió un endoso a favor de Citibank, garantizando, una vez más, rango preferente a los pagarés de $2,000,000.00 y $2,300,000.00 sobre los pagarés de $250,000.00. (Exhibit 5). Citibank no hubiese tenido que retener suma de dinero alguna si la parte demandante le hubiese exigido a Citibank que asegurara su interés con las pólizas emitidas por First American Title Insurance Company. ”
*1131 Esta parte entiende que los términos pactados son claros, por lo que no requieren otra interpretación. No le asiste la razón a los demandantes. Veamos.
La parte demandante tenía, desde marzo de 1992, la obligación de cancelar los pagarés que en 1995 reclamó a Banco Santander. No lo hizo, Además, al incumplir el demandante con los términos y condiciones del contrato de línea de crédito, pues nunca rotaba y/o “limpiaba” los balances adeudados a la línea de crédito, el Banco podía declarar vencida la deuda y exigir el pago de las sumas adeudadas, tal y como lo hizo.
Por otro lado, al entregar los cuatro pagarés en 1986 y suscribir el “Recibo de Valores Depositados en Custodia”, la parte demandante liberó de toda responsabilidad a Banco Santander. De conformidad al relevo la parte demandante está impedida de reclamar daños como consecuencia de la pérdida o destrucción de los pagarés. Esto nunca sucedió, pues, finalmente, el Banco pudo localizar los pagarés. Más si, al amparo del Artículo 1802 del Código Civil, se reclamaron daños como consecuencia de la alegada negligencia de Banco Santander al extraviar los pagarés, la acción estaría prescrita, pues los demandantes reclamaron los pagarés en junio de 1995, pero instaron la reclamación del epígrafe en agosto de 1997.
La parte demandante incumplió con sus obligaciones conforme ¡o establecido en los Contratos (de Préstamo y de Línea de Crédito) suscritos el 6 de marzo de 1992. Nunca canceló los pagarés en controversia y nunca manejó la línea de crédito otorgada conforme lo contratado.
Banco Santander ni fue negligente, ni incumplió con los términos y condiciones pactados por las partes. Los daños, si alguno, fueron ocasionados como consecuencia de las actuaciones y/u omisiones de terceros, en este caso Citibank, y no por el demandado Banco Santander Puerto Rico.
El Banco acompañó su moción con el “Recibo de Valores Depositados en Custodia”, el contrato suscrito por las partes, la Escritura de Hipoteca en Garantía de Pagaré con Interés Fluctuante, y las partes pertinentes de la deposición tomada a la señora Eva Magali Figueroa de Enriquez, Supervisora del Banco a cargo de la cuenta (pág. 188 a 225 de los autos originales).
El tribunal fraccionó la reclamación de los aquí apelantes contra el Banco Santander. Procedió a celebrar vista evidenciaría sobre responsabilidad los días 12, 13, 14 y 15 de abril de 2004, en la cual se presentó tanto prueba testifical como documental.
El 17 de junio de 2004, el foro recurrido, de conformidad con la prueba presentada y la credibilidad que la misma le mereció, declaró No Ha Lugar la demanda presentada mediante las siguientes determinaciones de hechos y de derecho:

“DETERMINACIONES DE HECHOS

1. Para el mes de abril de 1986 y debido a una transición entre el Banco Comercial con el Banco Santander comenzó una relación comercial entre “Empresas” [1]y “Banco”.

2. Como parte de esas relaciones comerciales, el “Banco” le concedió a “Empresas” una Línea de Crédito y un préstamo a plazos. Ambos créditos fueron garantizados mediante un Pagaré Hipotecario por DOS MILLONES DE DOLARES ($2,000,000.00), affidavit 6713 reconocida y suscrita ante el Notario José M. Biaggi Junquera el 1ro. de abril de 1986, garantizado por Escritura de Hipoteca en Garantía de Pagaré número 33, de la misma fecha y ante el mismo Notario.

Igualmente fueron entregados en custodia al “Banco ”, cuatro pagarés ascendentes a UN MILLON DE 
*1132
DOLARES ($1,000,000.00) y los cuales fueron postergados según la Escritura número 34 del 1ro. de abril de 1986.

3. Debido a los atrasos en abonos al principal de la línea de crédito, para el 06 de marzo de 1992, “Empresas” y “Banco” renegociaron la deuda existente y firmaron una renovación de la línea de crédito por DOS PUNTO TRES MILLONES DE DOLARES (2,300,000.00) y un préstamo con término a plazos por dos millones de dólares ($2,000,000.00).

4. Para el préstamo de DOS MILLONES ($2,000,000.00), las partes suscribieron un contrato titulado “Contrato de Préstamo y de Cesión de Cuentas por Cobrar”, reconocido y suscrito el 6 de marzo de 1992 ante el Notario José L. Landrón Ramery y otro titulado “Línea de Crédito ” por dos punto tres millones de dólares ($2,300,000.00).

5. El contrato de línea de crédito tenía vigencia de un(l) año a partir de la firma del mismo.

Para garantizar dicha acreencia, el deudor “Empresas” garantizó el mismo con el pagaré de dos millones de dólares ($2,000,000.00) mencionado en el hecho número dos (02), un pagaré hipotecario por dos punto tres ($2,300,000.00) millones de dólares suscrito el 6 de marzo de 1992 garantizado por Escritura Número 118 ante el notario José L. Landrón Ramery y tres (3) cartas de garantía continuas.

6. Como parte del contrato de Línea de Crédito se establecieron varias cláusulas sobre su incumplimiento entre éstas las siguientes:

“(F) Incumplimiento. La Línea de Crédito quedará cancelada y el Banco podrá a su opción, acelerar el vencimiento de todos o cualesquiera de los préstamos y proceder a su cobro por la vía judicial al ocurrir cualesquiera de los siguientes eventos:

(i) Falta de pago de intereses por parte de la corporación en su fecha de vencimiento; y/o,

(ii) Incumplimiento por parte de la corporación con cualesquiera de los términos y condiciones del presente contrato, o cualquier otra obligación para con el Banco.

(G) Propósito. Los préstamos bajo la Línea de Crédito se utilizarán por la Corporación para compra de mercancía para reventa en su negocio de Almacén de Víveres. ”

7. En su obligación número 5, el contrato dispone lo siguiente:

“(5) El presente contrato no podrá ser alterado, modificado o novado verbalmente, solamente lo podrá ser por escrito y otorgado con las mismas formalidades del presente contrato.”

8. Los desembolsos conforme al referido contrato se harían con vencimiento de treinta (30), sesenta (60), noventa (90), ciento veinte (120) días o un año a partir de la fecha de otorgado.

9. El “Banco” realizó los desembolsos requeridos y la cuenta casi siempre se mantenía cerca del tope.

10. “Empresas” no realizaba los pagos con la frecuencia establecida y sólo hacía algún abono esporádico.

11. “Empresas" utilizaba la línea de crédito para hacer arreglos a sus estructuras y otras inversiones, contrario a la obligación contractual.

*1133
12. Mediante la Escritura número 118 sobre Hipoteca en garantía de pagaré con interés fluctuante, el Sr. Pablo Belford Ramírez Asencio, en representación de empresas, se comprometió a cancelar los pagarés que había postergado, los cuales informó que estaban extraviados y nunca los canceló, páginas 1210 y 1214 de escritura. También, el Sr. Pablo Belford Ramírez Asencio otorgó varias declaraciones juradas, sosteniendo que los pagarés, que en total ascendían a un millón de dólares ($1,000,000.00), estaban extraviados.

13. Los pagarés extraviados fueron los que “Empresas" entregó en custodia al “Banco” el 1ro. de abril de 1986 y nunca los reclamó; por el contrario, para el año 1992 al otorgar la escritura número 118 alegó que estaban extraviados y que los cancelaría.

14. El “Banco ” cumplió con su obligación y hacía los desembolsos según el contrato.

15. “Empresas” no pagaba la Línea de Crédito conforme a los términos del contrato; esto es, según los términos de 30, 60, 90, 120 días o un año y a su vencimiento que tenían que pagarse. A esto se le llamaba rotación.

16. El contrato de Línea de Crédito venció el 06 de marzo del 1993 y “Empresas" tenía la misma al tope. El “Banco” concedió prórrogas hasta octubre de 1993 y marzo del 1994 para el pago.

17. La línea de crédito tenía que rotarse regularmente, lo que implicaba que al hacer abono de equis cantidad, al otro día el dinero estaría disponible nuevamente para Uso de “Empresas”. La contención de “Empresas ” era mantener el dinero en la cuenta corriente y no limpiar o rotar la Línea de Crédito.

18. Debido a la falta de rotación adecuada, el Federal Deposit Insurance Company (FDIC) clasificó la cuenta en Vigilancia Especial.

19. El “Banco ”, a través de sus oficiales (“Sra. Magalie Figueroa de Enriquez”), a finales del 1993 le solicitó a “Empresas” un abono de un millón de dólares ($1,000,000.00) a la Línea de Crédito, el cuál no se hizo, ya que el contrato estaba vencido y no se pagaba.

20. Dicho reclamo obedecía a que el Comité de Crédito estaba preocupado por el no pago y rotación de la cuenta, la que ya había sido clasificada por el F.D.I.C.

21. Ante tal situación, el Comité de Crédito tenía la intención de reducir la línea de crédito en un millón de dólares ($1,000,000.00).

22. El Sr. Sampedro y la Sra. Figueroa continuaron en gestiones con empresas hasta que afínales del año 1994 visitan el Almacén Belford Ramírez y se reúnen con el Sr. Pablo Belford Ramírez Asencio.

23. El propósito de la reunión fue ofrecerle alternativas al Sr. Ramírez Asencio y solicitarle un millón de dólares ($1,000,000.00) en abono a la Línea de Crédito. Entre las alternativas que se discutieron estaban, primero, hacer abono de un millón de dólares ($1,000,000.00), segunda o, poner la Línea de Crédito en un plan de pago a tres (03) años o más colaterales.

24. Dichas alternativas fueron rechazadas por Pablo Belford Ramírez Asencio, representante de “Empresas”, y el Sr. Sanpedro le sugirió entonces un abono de dos millones de dólares ($2,000,000.00) para poder persuadir al Comité de Crédito en cuanto a la renovación de la Línea de Crédito, alternativa que también fue rechazada.

25. Ante tal incumplimiento, el Comité de Crédito del Banco decidió reducir la Línea de Crédito de

*1134
“Empresas” en un millón de dólares ($1,000,000.00).

26. Cabe señalar que dicho incumplimiento era desde antes del año 1992, o sea para el año 1990-1991 y a la Sra. Figueroa había tenido reuniones con Pablo Belford Ramírez Asencio y Doña Casta Montalvo por no rotar la línea de crédito.

27. La Línea de Crédito concedida a “Empresas” era una reconductiva; esto es, tenía que pagarse y luego el crédito estaba disponible.

28. Los pagarés extraviados por los cuales hace reclamo “Empresas” no eran colaterales a los préstamos de dos millones de dólares ($2,000,000.00) y dos punto tres millones de dólares concedidos por el “Banco”.

29. Luego de haberse reducido la Línea de Crédito a uno punto tres millones de dólares ($1,300,000.00), el “Banco” nunca prometió restablecerla a dos punto tres millones de dólares ($2,300,000.00) dicha línea.

30. “Empresas ” no aportó prueba que estableciera el cumplimiento con las cláusulas contractuales sobre la Línea de Crédito. Tampoco probó que hiciera los pagos de la Línea de Crédito de la manera establecida en el Contrato.

31. “Empresas ” utilizó la Línea de Crédito a su manera y el “Banco "fue leniente y pasivo en el cobro.

32. El “Banco” tenía la prerrogativa de retirar de las cuentas corrientes de “Empresas” para amortizar a la Línea de Crédito y no lo hizo para no agravar la situación de empresas porque las dejaba sin efectivo para operar.

33. Conforme al contrato, el “Banco ” tenía la facultad de reducir la Línea de Crédito por incumplimiento. Inciso F del contrato. Supra.

34. Del propio contrato, surge que la prerrogativa de conceder hasta un máximo de dos punto tres millones de dólares ($2,300,000.00) en la Línea de Crédito era del “Banco”.

35. Durante el año 1993 y año 1994, no había línea de crédito vigente y sólo existían las extensiones voluntarias concedidas por el “Banco ” a su ciencia y paciencia.

36. “Empresas” incumplió con las obligaciones contractuales al no pagar según lo acordado y usar el dinero de la Línea de Crédito para otras situaciones que estaban fuera del propósito para el cual fue concedida. La línea de crédito era expresamente para inventario, vender y pagar.

37. “Empresas”, en el año 1995, decidió voluntariamente contratar con otra entidad bancaria para que le financiara las operaciones de todos sus negocios.

38. El 30 de junio de 1995, suscribió un contrato de préstamo con Citibank, N.A., por la cantidad de cuatro punto cinco millones de dólares ($4.5,000,000), el cual posteriormente fue extendido a cuatro punto ocho millones de dólares ($4,800,000.00) para las operaciones de su negocio.

39. Con dicho préstamo pagó la acreencia de Banco Santander, que ascendía a dos millones ochocientos un mil setecientos cuarentiseis dólares con sesenta y un centavos ($2,801,746.61).

40. El contrato entre “Empresas” y “Banco" nunca fue renovado, modificado, alterado o novado según sus propios términos, véase inciso 5 del contrato.

*1135 41. “Empresas”, mediante Carta preparada por Ramírez Montalvo y firmada por su padre Ramírez Asencio, notificó al “Banco” su intención de cancelar la relación comercial(Sentencia apelada, énfasis nuestro).
Evaluadas las anteriores Determinaciones de Hechos probados, este Tribunal llega a las siguientes:
CONCLUSIONES DE DERECHO
El “Banco” en el caso de marras no le responde a “Empresas” de los reclamos por incumplimiento de contrato y daños y perjuicios. Veamos.
Ambas reclamaciones están regulados por nuestro derecho de contratos consignado en nuestro Código Civil. El Artículo 1207 del Código Civil, 31 L.P.R.A. 3372, consagra el principio de la autonomía de la voluntad de los contratantes.
En dicho artículo se dispone que: “Los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público. ”
Este artículo establece un principio de libertad en la contratación. Esto significa que, salvo las restricciones que establece la ley, las partes contratantes pueden establecer los acuerdos que estimen convenientes. De la misma forma, una vez se perfecciona un contrato, las partes quedan obligadas a cumplir con los términos del mismo y con todas las consecuencias naturales de dicho contrato que no sean contrarias a la ley, al uso y costumbre y ni a la buena fe. Jarra Corporation v. Axxis Corporation, 2001 J.T.S. 167.
Los contratos tienen fuerza de ley entre las partes. Por tanto, una vez otorgados los contratantes deben dar fiel cumplimiento a lo pactado. Además, nuestro Código Civil establece que “si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas. ” Art. 1233; Irizarry v. García Cámara, 2001 J.T.S. 164.
En el presente caso estamos ante una reclamación de incumplimiento de un contrato de línea de crédito. Al analizar el mismo nos damos cuenta de que sus cláusulas son válidas y claras. No existen indicios de que se haya otorgado un contrato contrario a los principios que enuncia nuestro derecho.
Debido a ello, al interpretar las cláusulas del contrato al amparo de la reclamación presentada, nos damos cuenta de que Banco no incumplió con las obligaciones pactadas. Por el contrario, fue Empresas quien incumplió con lo convenido.
Conforme a lo pactado, “Banco” se obligó a conceder hasta un máximo de 2.3 millones en la Línea de Crédito y “Empresas” por su parte se obligó a rotar la misma con pagos recurrentes en términos de 3©, 60,90,120 días o un (1) año.
De la prueba creída por el Tribunal se desprende que el “Banco” concedió los desembolsos de la Línea hasta el máximo permitido, pero hubo ausencia de la frecuencia de pagos. Incluso a su vencimiento, el 06 de marzo de 1993, no se había pagado.
La prueba presentada demostró qué “Banco” siempre cumplió con su obligación, no así “Empresas^, qraem no pagaba de acuerdo al contrato y utilizaba dichos fondos contrario a lo establecido.
Ahora bien, en el presente caso, vencido en contrato el 06 de marzo de 1993, no había obligaciones contractuales vigentes, por lo que no puede alegarse incumplimiento cuando Banco comenzó a exigir el pago *1136 del principal de la deuda, una vez estaba vencida la misma.
En vista de lo anterior, notamos cómo Banco cumplió con su parte en la obligación pactada y Empresas lo que ha pretendido es variar a su antojo las obligaciones. Con su conducta, Empresas ha querido determinar la forma en la que sería pagada la obligación y pretende imputar incumplimiento al acreedor cuando Banco lo único que éste ha hecho es procurar el cobro de una deuda líquida y exigible.
Avalar el reclamo de la parte demandante sobre incumplimiento con las obligaciones en el contrato de controversia, es concederle que unilateralmente, él decida cómo y cuándo cumplir. En ese sentido es de aplicación lo dispuesto en el Artículo 1208: “La validez y el cumplimiento de los contratos no pueden dejarse al arbitrio de uno de los contratantes.'” Por otra parte, los Tribunales de Justicia no pueden relevar a una parte de cumplir con lo que se obligó a hacer mediante contrato cuando dicho contrato es legal y válido y no contiene vicio alguno. Cervecería India v. Commonwealth Ins. Co., 115 DPR 345 (1984).
Se ha alegado que el hecho de que Banco no cerrara la cuenta al momento de vencimiento, constituia una novación del contrato original. No estamos de acuerdo. Aquí se trata de un contrato original que llegó a su vencimiento y en el que Banco, a lo sumo, lo que estaba era permitiendo unas condiciones para el pago. No hubo tal cosa como una novación, sino una negociación en la forma de pago de la primera obligación. Nótese que el propio contrato disponía las formas de novación y en ningún momento se demostró que se otorgaran nuevas obligaciones o se modificaran las mismas por escrito.
No podemos reconocer un reclamo contractual con respecto a las concesiones y buena fe del Banco acreedor. La realidad es que estamos ante una situación en la que Banco postergó ejercer los derechos legales que tenía para ejecutar el cobro de la deuda. Por tanto, su medida de reducir la línea de crédito es válida en derecho y no estaba limitada por contrato alguno. El contrato de línea de crédito entre Empresas y Banco venció en 1993.
Aun asumiendo que Banco hizo una serie de promesas y ofrecimientos verbales y aun aceptando que éstas daban a entender que se provocaba una variación en los términos del contrato, las mismas no son válidas y por lo tanto no le reconocemos efecto jurídico. Esto es contrario al propio texto del acuerdo original en el que claramente se establece que la única forma de variar dicho acuerdo sería por escrito.
No podemos reconocer bajo estas circunstancias una novación. Nuestro Tribunal Supremo ha expresado que por estar en juego una cuestión de intención, la novación nunca se presume. United Surety and Indemnity Insurance Co. v. Bayamón Steel Processors, 2004 J.T.S. 65. Recálcamos que en este caso no estamos ante una modificación del acuerdo de voluntades entre los contratantes, sino ante el incumplimiento de una de las partes, quien después de haberse obligado, unilateralmente quiso establecer cómo pagaría su obligación. Lo que Empresas reclama es que reconozcamos una acción por incumplimiento de contrato a base de la liberalidad de Banco. Esto no es posible.
En cuanto a la reclamación bajo el Artículo 1802, 31 LPRA See. 5141, exigiendo una compensación por el Banco alegadamente haber retenido 4 pagarés en custodia desde el 1ro. de abril de 1986, el demandante tampoco tiene razón.
De entrada, hay que señalar que el Sr. Pablo Belford Ramírez Asencio se comprometió, por escritura pública y desde el año 1992, a cancelar los mismos por haberlos declarado extraviados y luego nunca los canceló.
Además de esto, dichos pagarés no formaban parte de las colaterales dadas al “Banco” en garantía de los préstamos sobre Línea de Crédito, por lo que ninguna responsabilidad puede atribuirle ahora al “Banco”. Se *1137 demostró que el único contrato que Empresas y Banco hicieron con respecto a esos pagarés fue entregarlos a Banco en custodia, o en lenguaje popular, para que los guardara, pero Banco no tenía ningún derecho sobre los mismos y éstos no garantizaban ninguna obligación entre Empresas y Banco. Estos eran valores pertenecientes a Empresas y ellos podían solicitar su devolución o gestionar su cancelación y ello no afectaba las obligaciones contraídas con Banco.
Como “Empresas” no había cancelado los pagarés para el año 1995, Citibank le ordenó a San Juan Abstract & Company la retención de setecientos mil dólares ($700,000) para garantizar el rango de la Escritura que se pretendía inscribir para garantizar su acreencia.
Empresas pretende que se le imponga responsabilidad al “Banco” por sus propios actos, lo cual es contrario a nuestro derecho y a la mejor administración de la justicia. A nadie es lícito ir contra sus propios actos. Este es un principio general de derecho que ordena proceder de buena fe en la vida jurídica. La conducta contradictoria no tiene lugar en el campo del Derecho, y debe ser impedida. Int. General Electric v. Concrete Builders, 104 DPR 871, 877-878 (1976).
Por otra parte, cabe señalar que “Empresas” accedió a la retención requerida por Citibank de forma voluntaria.
Por último, el hecho que el “Banco” no ejerciera el derecho que le concedía el contrato de acelerar la deuda y cobrarla, ello no implicó abdicar su derecho a recobrar su acreencia, ni constituyó modificación, alteración, renovación y/o novación del referido contrato. ” (Sentencia apelada, énfasis nuestro).
Insatisfechos con la sentencia dictada, Belford recurre ante nosotros y formula los siguientes señalamientos de error:

“1. Erró el Tribunal de Primer Instancia al Desatender la Realidad no Controvertida de que el Banco Santander Siempre Tuvo Bajo su Control el Cumplimiento de las Obligaciones de la Apelante Bajo la Línea de Crédito, y que la Apelante autorizó y el Banco Estaba Llamado a Efectuar las Transferencias o Cargos Automáticos de la Cuenta Corriente de la Apelante a la Línea.

2. Erró el Honorable Tribunal de Instancia al Determinar que la Demandante Podía Variar a su Antojo las Obligaciones Contraídas con el Banco y Determinar la Forma en que Serían Pagadas.

3. Erró el Tribunal de Instancia al Determinar que Como el Contrato de la Línea de Crédito no Podía ser , Modificado o Renovado, a Menos que se Hiciera por Escrito, no Podían Crearse Posteriormente Relaciones Obligacionales, por Escrito o Verbales.

4. Erró el Tribunal de Instancia al no Determinar que Banco Santander Tenía la Obligación Legal de Notificar de Antemano a la Apelante la Cancelación Parcial de la Línea de Crédito.

5. Erró el Tribunal de Instancia al Determinar que la Apelante no Efectuó el Abono de $1,000,000.00 que le Solicitó Banco Santander, Cuando la Prueba no Controvertida Estableció que el Abono sí se Hizo.

6. Erró el Tribunal de Instancia al Acoger y dar Peso Probatorio a una Escuela de Declaración Sobre una Supuesta Clasificación por el Federal Deposit Insurance Company (FDIC), en Ausencia de Prueba Documental al Respecto. ”

Los examinamos.
*1138 II
Belford sostiene que era la responsabilidad del Banco efectuar las transferencias de la cuenta corriente a la línea de crédito. No estamos de acuerdo. El contrato entre las partes dispone que el retiro de la cuenta corriente y transferir el mismo a la línea de crédito era una prerrogativa, no una obligación del Banco. Quien sí poseía una obligación lo era el apelante, quien estaba obligado a pagar la cantidad adeudada al Banco de manera de no quebrantar lo pactado entre él y la institución bancaria.
El Código Civil de Puerto Rico, en su Artículo 1042, dispone que las obligaciones “nacen de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitos o en que intervenga cualquier género de culpa o negligencia”. (31 L.P.R.A. §2992). Sabido es que las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse a tenor de los mismos. (31 L.P.R.A. §2994). El contrato es, por tanto, un acto de voluntad generador de obligaciones y al mismo tiempo es la actuación o estado jurídico que deja establecido.
En la interpretación de los contratos deberá atenderse principal y especialmente a la voluntad de las partes que hay que aceptar y cumplir. Si la letra aparece 'clara sin lugar a dudas no cabe recurrir a reglas de interpretación. Véase, Cooperativa La Sagrada Familia v. Castillo, 107 D.P.R. 405 (1978); Merle v. West Bend Co., 97 D.P.R. 403 (1969); Luce & Co. v. J.E.T., 86 D.P.R. 425 (1962). Así, el Artículo 1233 del Código Civil dispone que si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas. Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aquéllas. (31 L.P.R.A. §3471).
Los términos pactados entre el Banco Santander y Belford fueron claros, por lo que no requerían ninguna otra interpretación. El apelante incumplió con los términos y condiciones del contrato de línea de crédito. La prueba demostró que nunca rotaba y/o “limpiaba” los balances adeudados a la línea de crédito, por lo que el Banco- podía declarar vencida la deuda y exigir el pago de las sumas adeudadas sin tener que retirar de las cuentas corrientes del apelante.
En su escrito apelativo, el apelante reconoce “que el principal de la línea de crédito no se rotaba frecuentemente (pág. 6 del escrito de Apelación). Más aún, en el juicio, Belford Ramírez Asencio reconoció que la empresa no estaba haciendo abonos a la cuenta de conformidad con lo contratado (pág. 180 de la Transcripción).
III
En su segundo señalamiento de error, el apelante sostiene que el foro recurrido indicó, equivocadamente en su sentencia, que éstos (los aquí apelantes) podían variar a su antojo las obligaciones contraídas con el Banco y determinar la forma en que éstas serían pagadas. No estamos de acuerdo. En sus determinaciones de hechos, el foro recurrido se limitó a señalar situaciones que el propio apelante propició con sus actuaciones. Entre éstas:

“10. “Empresas” no realizaba los pagos con la frecuencia establecida y sólo hacía algún abono esporádico.

11. “Empresas” utilizaba la línea de crédito para hacer arreglos a sus estructuras y otras inversiones, contrario a la obligación contractual.

15. “Empresas" no pagaba la línea de crédito conforme a los términos del contrato, esto según los términos de 30, 60, 90, 120 días o un año y a su vencimiento que tenían que pagarse. A esto se le llamaba rotación.

36. “Empresas” incumplió con las obligaciones contractuales al no pagar según lo acordado y usar el 
*1139
dinero de la Línea de Crédito para otras situaciones que estaban fuera del propósito para el cual fue concedida. La línea de crédito era expresamente para inventario, vender y pagar. ”

Contrario a lo alegado, el foro recurrido se limitó a reseñar hechos incontrovertibles demostrativos del incumplimiento del apelante con las obligaciones contraídas con el Banco.
Belford sostiene que es contradictorio que el foro recurrido determine que, como el contrato no podía ser modificado o renovado a menos que se hiciera por escrito, no podían crearse posteriormente relaciones obligacionales. Plantea Belford que “vencido el contrato, podían crearse las relaciones obligacionales que fueran, ya por escrito o verbales, pues la cláusula que exigía la modificación por escrito no estaba vigente.” (Escrito de apelación, pág. 14).
El foro recurrido determinó que el contrato de línea de crédito venció el 6 de marzo de 1993, que Belford no pagó la suma adeudada y que no hubo novación alguna en la relación existente entre las partes.
La propia parte apelante reconoció que no rotaba la línea de crédito como se había acordado y que utilizó los dineros para otros fines que no eran los contratados. Sería absurdo pensar como alega la parte apelante, que no existía un vínculo contractual después del 6 de marzo de 1993. La parte apelante tenía la obligación de pagar la suma de $2,300,000.00 y se negaba a pagar.
El hecho de que el tribunal de instancia expresara que no existió novación en el contrato y que durante el año 1993 y el año 1994 no había línea de crédito vigente y sólo existían las extensiones voluntarias concedidas por el Banco, esto no eliminaba ni extinguía la obligación contraída por el apelante al momento de la contratación y quedaba pendiente lo adeudado. Lo expresado por el Tribunal de Instancia no representa, como se invoca, contradicción alguna.
IV
Belford sostiene en su cuarto señalamiento de error que el Banco Santander tenía la obligación legal de motificarle de antemano la cancelación parcial de la línea de crédito. No estamos de acuerdo. El contrato de la línea de crédito no se encontraba vigente al momento de la reducción en la línea de crédito. Por ello y como correctamente señala el foro recurrido, en “el año 1993 y 1994 no había línea de crédito vigente y sólo existían las extensiones voluntarias concedidas por el Banco a su ciencia y paciencia” (pág. 94 del escrito de apelación).
Por otro lado y para apoyar su argumento de que el Banco tenía la obligación de notificarle de antemano la cancelación parcial de la línea de crédito, Belford se apoya en los casos Reid v. Key Bank of Southern Maine, Inc., 821 F. 2nd 9 (U.S. Court of Appeals, First Circuit, 1987), y K.M.C. Co., Inc. vs. Irving Trust Co., 757 F. 2nd 752 (U.S. Court of Appeals, Sixth Circuit, 1985). Es preciso señalar que ambos casos han sido negativamente distinguidos por Solar Motors, Inc. vs. First National Bank of Chadron, 547 N.W. 2d. 527 (4 Neb. App. 1, 1995) en donde se expresa que tanto Reid, supra, como K.M.C., supra, pertenecen a un punto de vista minoritario en las jurisdicciones estadounidenses. El caso de Solar Motors, supra, va más allá e indica que tradicionalmente un acreedor puede cobrar un préstamo en cualquier momento, por cualquier razón o sin ella. No erró el foro recurrido al resolver que el Banco no tenía ninguna obligación de notificar a los apelantes al momento de cobrar o disminuir la línea de crédito.
Belford sostiene que el foro recurrido incidió al determinar que éste no efectuó el abono de un millón de dólares ($1,000,000.00) que le solicitó el Banco, cuando la prueba estableció que sí se hizo el abono.
Contrario a lo alegado por la parte apelante, el Tribunal de Primera Instancia reconoció en los párrafos 25 y 29 de las Determinaciones de Hechos de la Sentencia que la parte apelante abonó la suma de $1,000,000.00. *1140 Cuando el apelante alega que efectuó un abono a la línea de crédito, ésta figuraba vencida. Ese hecho no fue controvertido. Contrario a lo señalado, la prueba demostró que Belford reconoció en varias ocasiones que tenía conocimiento de que no estaba rotando la línea de crédito adecuadamente.
La falta de diligencia del apelante quedó evidenciada en el testimonio de la señora Magalie Figueroa de Enriquez, Supervisora del Banco, quien aseguró que Belford Ramírez Asencio le explicó cómo había utilizado fondos de la línea de crédito para mejoras, no para capital de trabajo. (Deposición, págs. 215-220 de los autos originales.) Dicho uso constituia un incumplimiento y era contrario a las cláusulas del contrato. El foro recurrido concedió entera credibilidad a la señora Figueroa.
V
El examen de la prueba ante nos revela que la sentencia apelada es esencialmente correcta. En consecuencia, se confirma.
Notifíquese.
Lo pronunció y manda el Tribunal y lo certifica la Secretaria del Tribunal.
Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones
ESCOLIO 2005 DTA 54
1. Se refiere al apelante Belford.